Case No. 19-3986 Henry Navas-Medina v. William Barr, oral argument not to exceed 15 minutes per side. Ms. Knowles for the petitioner. Ms. Knowles, you may proceed. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Elizabeth Knowles. I am pro bono counsel for the petitioner in this case, Mr. Henry Navas-Medina. Today, we ask this Court to sustain the appeal of the petitioner and to remand the case for the following three reasons. First, Mr. Navas is a member of a cognizable particular social group, that of males in his family who share the Navas surname, and that he demonstrated that the persecution he suffered was on account of a protected ground, namely his particular social group, and that the Board erred in determining otherwise. Second, the Honduran government is unable or unwilling to control the Mara Salvatrucha 13 gang and its violence towards targeted individuals, and the Board erred in finding to the contrary. And finally, third, that Mr. Navas established that it is more likely than not that he would be tortured if removed to Honduras, and the Board erred in finding to the contrary. Mr. Navas-Medina, a national of Honduras, was severely beaten and threatened by criminal gang members of the MS-13 organization. Ms. Knowles. Yes, Your Honor. I'm sorry to interrupt you. Thank you for representing Mr. Navas-Medina. I have a quick question. It's just a clarification question. I think you clarified it right in your intro, but I just want to make sure below Mr. Navas-Medina argued for three different social groups, and it was three different ways of looking at his family. But really, the thrust of it, and it seems the only argument on appeal, just so I'm clear, and we can focus on that in argument, is that the group, the social group that you propose, is male members of the Navas family. Am I correct in that? It seems your brief laid that out pretty clearly, but I just want to be sure. That is correct, Your Honor. Specifically, the proposed social group is male members of the Navas family who share the Navas surname. Correct. Okay, and so what evidence is there that Honduran society, and not just MS-13, ascribes special meaning to the Navas family, to male members of the Navas family? Go ahead. I'm sorry. That's fine. Thank you for the question, Your Honor. The evidence that Honduran society does see the Navas family as distinct within society is in that the MS-13 is so pervasive, and their is known when individuals are being targeted. So, it would be known in the regions where Mr. Navas's family, male members of his family, have lived. Can I ask you a question, and this might not be technically, but I'm just curious. I mean, MS-13 is known worldwide, right, as being that Doesn't that apply to almost everyone in Honduras or elsewhere? It would, Your Honor. The distinction in this case is that Mr. Navas's father, who was a naval sergeant, killed a lead member of the MS-13 gang during his duties as an officer, and that created a sort of notoriety for the Navas family, and it's an incident that Can I ask a separate question? Because I appreciate that you laid that out well in your brief, but I guess if there was a rival gang, which there is in Honduras, for example, and one of them killed an MS-13 member, would that make them a social group that qualifies the rival gang? Because MS-13 was now hunting them down as part of a gang war? Potentially, Your Honor, but we are dealing with the family as a cognizable social group, as contemplated in Al-Gorbani v. Holder, which this court has found that the family is a cognizable social group as long as they meet the particularity and social distinction requirements required in matter of MEVG, which we assert that Mr. Navas Medina does, in fact, meet those requirements for these same reasons that his father, who was a member, who was a naval sergeant in the line of duty, killed an individual of the gang. And going back to your question, Your Honor, I think that the relationship between police or military and these criminal organizations like MS-13, and in your example, Your Honor, the relationship between a gang and a rival gang, are very different, and their methods of retaliation may also reflect those differences. In this case, in Mr. Navas' case, he has testified and provided evidence surrounding the fact that the gang, the MS-13 in this situation, found that a gap needed to be filled, and that the debt owed to the MS-13 was that a male member of the Navas family was to replace the death of that gang member that his father killed, and they targeted him to fill that debt or suffer death, or continuous torture like the torture that he did suffer already. And so Mr. Navas testified at the immigration court level and before the Board of Immigration Appeals through written advocacy, that all the male members of the Navas family, be it him or his uncle, who actually, one of his uncles joined the gang because he could not, he had no other avenue. He has a blood brother who has escaped to where he believes is Belize. His father himself was killed by MS-13 members who followed him to Belize right before he was supposed to meet with him again. Counselor, if I could take you back to Judge Thapar's question about does Honduran society treat the Navas' male Navas' the way MS-13 does. I understood what you'd said several minutes ago in your brief, effectively to say, well MS-13 is so pervasive that Honduran society must look at people the same way an MS-13 does. I may be overstating, but I didn't see that there was any evidence on this point presented. In other words, is there an expert or a person who says not what MS-13 thinks about the Navas' but that indeed all of society sees people the same way MS-13 does. Your explanation was not crazy, but I didn't see any evidence had been presented to support it. Did I miss something? Your Honor, if I understand your question correctly, you are asking me, the court is asking me if Honduran society sees the Navas' family the same way that MS-13 does. And if there's any evidence to that, that is your argument. I kind of understand the argument and I can say, well, maybe she's right, maybe she's not. But was there any evidence presented below that would address that? Your Honor, my answer is yes. And I would respectfully make a distinction between the way that Honduran society sees Mr. Navas' family and the male members and the way that MS-13 sees Mr. Navas' family and its male members. In that, social distinction requires that society acknowledges that they are a group, but not necessarily that they view that group in the way that the MS-13 or the perpetrator would view. You said yes, and then you began to spin off into argument and law. That is, I was asking, where in the record would I look for something that says the argument you've been making? That is that if MS-13 treats them as a group, in some way Honduran society does. And again, you spun off into argument, but I didn't hear connection to the record. Your Honor, I believe that that evidence is embedded in the country conditions reports that show that Honduran society is very aware of the actions of MS-13. And inherently, when they're aware that a certain family is being targeted, there is a sort of caution that they would employ in dealing with that family. Doesn't there have to be evidence that we can rely upon? Because then that goes back to my other question, and you seem to imply this in your brief. At page nine, when you're talking about this, you start out with a topic sentence that says the family is a particular defined social group in Honduran society, but there's no evidence of this from which we as a court can conclude that. And then they naturally, any members of society who oppose the status quo and make any attempt to fight against the criminal gang members will carry a social reputation for sexual rebellion. The implication goes back to my gang question, which is anyone that fights against MS-13, we should consider as a cognizable social group in Honduran society because of their notoriety, MS-13's notoriety alone. And that seems problematic based on our case law. Your Honor, I would draw a distinction again respectfully that the MS-13 is targeting male members of his family as opposed to the MS-13 targeting any random individual member of society. I understand and I'm sorry if my question was poor, but my point being is what you're saying is the reason they're notorious in Honduran society is because MS-13 is essentially targeting them. The point is then anyone MS-13 targets could be considered notorious within Honduran society, including rival gangs, which would mean in essence, we would have to allow rival gangs into the country. I respectfully disagree with Your Honor. Explain why, based on the argument on page nine of your brief. Based on the argument on page nine of my brief, Your Honor, the argument is being made in furtherance of the group being the family members of Mr. Navas and that it isn't just that Mr. Navas isn't the person that killed the gang member, it was his father. And so the tie that is drawn, if I see my time has run, but if I may. You may complete your answer to Judge Tapar's question. Thank you, Your Honor. Mr. Navas did not kill the lead member of the gang, it was his father. And as a consequence and punishment for his father's actions, that desire for vengeance attaches to all male members of his family, not Mr. Navas Medina's father, who in your example, Your Honor, in the court's example, would be the person if in that potential hypothetical situation, a rival gang member killed him. Yeah, you've frozen. Oh, have I become unfrozen? We got disconnected, I think. Well, I can still hear you. I can still hear you. No, you're fine, Ms. Knowles. I don't know if that's a glitch in the system, but you're. Yeah, we can hear you. Nothing froze on my end, so I apologize. If I can just rephrase my last few words. Okay, yeah, and then would you just bring it to a close, but you can finish your answer. That Mr. Navas Medina's father would be in the court's hypothetical, the rival gang member, and he would become notorious, but that is not the situation in the present case before the court. Mr. Navas Medina's father created the situation, and as a result, has left in the aftermath this reputation for the male members of the Navas family. I think we've got the sense of that answer now, and I'm hearing some scrubbing noise in the background somewhere, so we thank you, and you'll have your full rebuttal. If Judge Tapar wants to flesh that out a bit more, we'll do it in your rebuttal time. Mr. Mack, we'll hear from you at this time. Thank you, Your Honor. Sir, you need to come on mute. Come off mute. Thank you. I apologize to the court. Good morning, and may it please the court. Greg Mack for the Attorney General. First of all, I just want to acknowledge that this is the son of a murdered police officer in a tough part of the world for law enforcement. These are the tough cases that are indeed assigned to the immigration judges and the Board of Immigration Appeals, and here, Petitioner did receive two levels of administrative review with respect to his application. The immigration judge and the board denied those applications, and the questions before the court is whether a reasonable person would be compelled to reverse those decisions, and we submit, as we stated in our brief, that the answer is no to that question. I'll join the court with where it was asking questions of my colleague with respect to social evidence of social distinction that the group proposed by the applicant has some distinction in the Honduran society, and it can't be done by mere testimony. It can't be done by a belief in what is inherent in the society. There has to be some sort of objective evidence that the court can hang its hat on, and that compels a reversal of the agency's decision, and there was just no such evidence presented in this case below. Now, the matter of MEVG also says you can't point to the alleged persecutors as a ground to show that your group is distinct within society because, after all, that then becomes circular, and the social distinction criteria basically begins to collapse. Now, my colleague also cited the Al Gorby decision. That decision arose prior to the persuasive effect here, so overall, the case fails on the social distinction prong as well as on the other prongs noted in our brief, particularly the particularity question, as well as on the ultimate point, really, with respect to nexus. It's our view that, as we noted in our brief, a nexus decision was made by the agency, and it's not noted or disputed in petitioner's Can you, can I just skip you, if you don't mind, to the Convention Against Torture and ask you about the allegations? It seems to me Novus Medina's best argument may be that the police were in cahoots with MS-13, and specifically the evidence about the grandparents' house going looking for him. What's your response to that argument? My response to that argument is he wasn't there at all during that incident. Now, certainly he says that he gave the gangs his neighbor's address, and then the neighbors pointed the gang, excuse me, neighbors, the police showed up at the neighbor's address, and then the neighbors pointed the police to the grandparents' address, but he wasn't present on this occasion. I'm sorry to interrupt, but doesn't that point out that the may be in cahoots with MS-13? Does that make sense? Well, and I'll say this, the record has to compel that result, and what we find is the grandparents went to the police, and the police said we weren't there. There was no police operation. Now, you can look at that evidence, say it runs one way, that, as your honor points out, well, of course, the police are in cahoots, and the police would certainly say that, but that's not the question at this level. The question has to be the record has to compel that conclusion, so what we have is the neighbors point the police, if you will, to the grandparents, the grandparents go to the police, and police say we had no operation in that area, and further, if we're dealing with cat, we have to also look at whether there's acquiescence. There's nothing in the record that says that the grandparents pushed that forward to that police agency or other police agencies. So this statement about the police saying we have no operation in that area, why does that negate the compulsion of the statement? I mean, certainly, if they're in cahoots, and they're doing something they shouldn't be doing, they're not going to just say, yeah, I mean, they're going to try to distance that or, you know, create some kind of subterfuge. So I'm not sure why that doesn't, why that negates the compulsion element of this. Well, and your honor, if you were a member of the Board of Immigration Appeals, you could go to war with the two other members of the board and argue about that inference. But at this level, the evidence has to compel that conclusion. And I would suggest I take it, I take it your alternative explanation would be it could be the gang claiming to be the police. Correct. It could be a false flag operation. That is that Judge Donald would be right, or potentially right if we agreed that the police's denials were false. But your position is the evidence doesn't compel us to believe that the police denials are false. There are other explanations. Correct, your honor. That's why I started out with if Judge Donald wanted to have that argument with other members of the board, or if she was an immigration judge, she could draw that conclusion. But at this level, the record has to run entirely in the grandparents. All we have is the grandparents going to the police and police saying, simply, we didn't have an operation in that area. So, and I think in terms of the overall question with respect to acquiescence in this case, we don't have reports. Petitioner wasn't present, Judge, the board at the grandparent incident. And cat is an extraordinary remedy. And we have to really show that the Honduran government would acquiesce in this sort of torture. And we just have that in this particular case. And I think we pointed to the unwilling and unable determination by the agency in that regard, that the Honduran government, and again, a tough part of the world, is endeavoring to combat gang violence. And we have to also look at the fact that petitioner's father was in prison at a particular point, but there were elements in the Honduran government that worked with him to escape from the jail. So there are elements from that particular piece of evidence showing that there's elements in the Honduran government that were willing to come to his father's aid. And what I don't see in this record is anything where petitioner pressed with the Honduran government at any level that said, wait a minute, remember my father, my father was murdered because he was working with you. Our family is in jeopardy. And therefore, we need the help of the Honduran government. We don't see any of that going on in this particular case. So with that, the court has the government's brief. I've answered the questions with respect to social distinction. And Cat, if there's any other questions, I'll be happy to answer. Yeah, if I could ask you about the D.C. Circuit Grace case. A, whether that undermines any of the positions you've taken with respect to A.B. or L.E.A. And secondly, has the government sought cert or does it plan to seek cert in Grace? To my knowledge, that hasn't that decision has been made yet, as far as I know. But with respect to the matter of A.B. and the Grace case, your court, your honor, actually has a case on that point, Juan Antonio, that says that it basically agrees with the matter of A.B. that the complete helplessness criterion is arbitrary. I didn't file a 28-J letter on it because no matter what moniker you put on the unwilling, unenable analysis here, whether you call it complete helplessness or unwilling, unenable, the answer is still this, the same, that the evidence points to the Honduran government trying to combat gang violence. So whether you call it complete helplessness or unwilling, unenable, the matter of A.B. doesn't undermine our position. Matter of A.B. said complete helplessness has to be shown. Grace and the court's decision in Juan Antonio agreeing with Grace basically says that's an arbitrary and capricious adoption of that term. But the evidence still shows, if we go back to unable, unwilling, still shows the Honduran willing to come to petitioner's aid. Any further questions? Judge Dupar, Judge Boggs, Mr. Mack, thank you so much for your written and oral advocacy. At this time, we'll go to Ms. Nose for her rebuttal. Thank you, your honors. Taken as a whole, the record does, taken as a whole, the record does confirm the conclusion that Mr. Navas cannot reasonably expect the assistance of the government controlling or evading the MS-13 without surrendering his life to the MARA. We find this requirement under Al Garbani from this court. And as pointed out in this court's very recent opinion in Antonio V. Barr, while the government does emphasize what Honduras, the small steps it has taken to alleviate continuous targeting of that it is more important to look at the numerous instances when the government has failed to act or even respond, as well as the harm the government failed to prevent. In fact, the country conditions that Mr. Navas submitted proved that the government's anti-corruption initiatives did not go far enough. The government institutions that were created did not take sufficient steps to contain high-level corruption and were unwilling or lacked professional capacity and resources to those involved. To the helplessness requirement stated in Grace V. Whitaker, the IJ and the board did conclude in this case that Mr. Navas did not meet his burden of showing that the Honduran government was helpless. And it relies on a standard that has been deemed arbitrary and capricious. In the case, your honors mentioned Grace V. Whitaker, the U.S. District Court for is arbitrary, capricious and contrary to law and not a permissible construction of the persecution requirement. The Sixth Circuit, to the point of acquiescence, the Sixth Circuit has interpreted acquiescence to mean that public officials have remained willfully blind to the severe pain or suffering that the attackers inflicted upon the victim. This comes from Amir V. Gonzalez from this court in 2006. Willful blindness simply requires that the state actors be aware of the sort of harm inflicted. Actual knowledge of the harm faced by the victim is not required. There is also a recent case, Guzman Vasquez V. Barr, which speaks to the point of allowing an individual who is seeking asylum or withholding of removal to have an opportunity on the record to discuss why certain information that the immigration judge may have found helpful in corroboration was not provided. And I would assert that in light of that in May of this year, that in looking at the transcript, that is lacking in this case. We would ask this court to find that Mr. Navas' social group of male members of the Navas family to be cognizable and that it meets particularity and social distinction. Also, that the Honduran government is in fact unable or unwilling to protect such individuals. And finally, that Mr. Navas is more likely than not to suffer torture and with the acquiescence of the Honduran government. Thank you, Your Honor. Thank you for your argument. We also thank you for with that. The matter is submitted and we thank both counsel for their written and oral advocacy. We will issue an opinion in due course. Thank you, Your Honors. Okay, I believe the remainder of the cases are submitted on the briefs and we will retire to the case conference room.